KENNETH W. DOEHRING, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Doehring v. Comm'r
Docket No. 4237-72 United States Tax Court
T.C. Memo 1974-234; 1974 Tax Ct. Memo LEXIS 84; 33 T.C.M. (CCH) 1035; T.C.M. (RIA) 74234; September 10, 1974, Filed. Harvey G. Schneider, for the petitioner John B. Turner, for the respondent FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies against the petitioner: Year
Deficiency 1962
$10,682.18
1963
$ 5,759.69
Mutual concessions having been made, it remains to be determined whether First Finance Company, a corporation of which petitioner was a shareholder, was entitled to elect to be taxed under Subchapter S of the Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Petitioner, Kenneth W. Doehring, filed Federal income tax returns for the years ended Decmeber 31, 1962 and 1963 with the district director of internal revenue at St. Louis, Missouri: he was a resident of Chesterfield, Missouri, on the date of the filing of his petition to this Court. *86 The petitioner and Paul E. Puckett of Birmingham, Alabama, each owned 50 percent of the outstanding stock of First Finance Company (Finance) throughout the period under consideration. Finance, a corporation organized on May 21, 1962, under the laws of Tennessee, was a regulated loan company operated under the Tennessee Industrial Loan and Thrift Act. [2] During its fiscal years ended October 31, 1962 and 1963 it maintained a regular place of business at Memphis, Tennessee, sought customers, employed a full-time staff, and can generally be said to have engaged actively in the operation of a lending and finance business, making loans to individuals in amounts not exceeding $500 and generally secured by mortgages on household goods. At no time during the period now before us was Finance a personal holding company within the meaning of section 542. The clientele of Finance during the years in question were of a type who could not borrow at a commercial bank or a consumer type finance company. Earning a low income, highly mobile and often unemployed, the typical loan applicant could not be serviced without a thorough *87 analysis of his financial status. Therefore when a loan was applied for, a member of Finance's staff would interview the prospective borrower, eliciting as much information relevant to the latter's ability and willingness to repay the loan, as could be obtained in this manner. On the basis of what he had learned, the staff member would prepare an application on the customer's behalf which would then be referred to one of several credit reporting agencies; but because the credit agency's files could not be relied on to be current in all cases, the staff of Finance would make further independent verification of the pertinent data. The processing of a new obligation would consume approximately one hour of a staff member's time, while a loan renewal would require an investigation of about 30 to 40 minutes. Following this procedure, Finance accepted 50 to 60 percent of the applications it received. Under Tennessee Industrial Loan and Thrift Act [3] Finance was permitted: (i) To charge for services rendered and expenses incurred in connection with investigating the moral and financial standing of the applicant, security for the loan, investigation of titles and other expenses incurred *88 in connection with the closing of any loan, an amount not to exceed four dollars ($4.00) per each one hundred dollars ($100) of the principal amount loaned, and a proportionate amount for any greater or lesser amount loaned, provided no charge shall be collected unless a loan shall have been made. Finance accordingly computed its service charges on the face amount of the loan, without regard to its duration or type. The service charges were computed in advance of the loan, were separately stated on the note signed by the borrower, and were not refundable in the event of prepayment. No service charge was made if the loan application was denied. During the taxable years ended October 31, 1962, and 1963, Finance's receipts (exclusive of repayment of principal) as reported on its books and records were as follows: Receipt Category
Year Ended 10/31/62
Year Ended 10/31/63 Interest
$ 966.52
$ 5,369.90
4% service charges (or industrial loan fees)
5,370.43
15,917.76
Delinquent charges
673.06
4,831.30
Accident & health insurance commissions
8,960.39
24,717.49
Fire insurance commissions
5,655.12
13,940.73
Miscellaneous -0-
2,454.00
Total receipts reported
$21,625.52
$67,231.18
*89 Its income tax return filed for the fiscal year ended October 31, 1962, with the district director of internal revenue at Nashville, Tennessee, disclosed a loss from operations in the amount of $29,111.93. Its return filed with the district director at St. Louis, Missouri, for the fiscal year ended October 31, 1963, indicated a loss from operations in the amount of $15,222.10. Pursuant to section 1372(a), a timely election was made to have Finance taxed under Subchapter S beginning with the first short period ended October 31, 1962. At no time during the taxable years at issue was that election ever revoked within the meaning of section 1372(e) (2) and the regulations thereunder; and during the taxable years at issue the said corporation qualified as a "small business corporation" as defined in section 1371(a). On his individual income tax returns for the years 1962 and 1963 petitioner claimed deductions in the amount of $14,556 and $7,611 as his distributive share of the loss incurred by Finance during its taxable years ended October 31, 1962 and 1963, respectively. On March 13, 1972, respondent issued a timely statutory notice of deficiency to petitioner determining *90 deficiencies in income taxes in the amounts of $10,682.18 for the year 1962 and $5,759.69 for the year 1963. The deficiency as determined in the statutory notice for the year 1962 is based upon respondent's determination that Finance's Subchapter S election had been terminated under section 1372(e) (5) and that the addition to reserve for bad debts claimed by Finance was not allowable to the extent of $9,999.49. [4] The entire amount of the deficiency as determined in the statutory notice for the year 1963 was based upon the respondent's determination that Finance's Subchapter S election had been terminated under section 1372(e) (5). ULTIMATE FINDING OF FACT Finance's Subchapter S election was terminated for its fiscal years ended October 31, 1962 and 1963 by operation of section 1372(e) (5). OPINION Petitioner has raised three issues in the instant case. Were we to decide any one of them in his favor, it would result in our finding that Finance's Subchapter S election had not been terminated for its fiscal years ended October 31, 1962 and 1963 by operation of section *91 1372(e) (5). The issues raised are these: (1) whether the receipt of interest by a corporation can cause the termination of the recipient's Subchapter S election under section 1372(e) (5) where that corporation is not a personal holding company within the meaning of section 542; (2) whether service charges such as those authorized under the Tennessee Industrial Loan and Thrift Act constitute interest within the meaning of section 1372(e) (5); (3) whether the return of the principal of loans is to be included within gross receipts within the meaning of section 1372(e) (5). As applicable to the years under consideration section 1372(e) (5) reads as follows: (e) (5) Personal Holding Company Income. - An election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). *92 Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation. Petitioner first asserts that this section's heading makes it inapplicable to lending or finance companies such as Finance, which are excluded from personal holding company status under section 542. We disagree. See Buhler Mortgage Co., 51 T.C. 971, 979 (1969), affd. per curiam 443 F.2d 1362 (C.A. 9, 1971); I. J. Marshall, 60 T.C. 242, 252 (1973), on appeal (C.A. 10, Nov. 12, 1973); Joseph B. Zychinski, 60 T.C. 950 (1973), on appeal (C.A. 8, Feb. 25, 1974).[5] Section 1372(e) (5) is to be interpreted without reference to sections 541 et seq. *93 Petitioner secondly asserts that service charges authorized by the Tennessee Industrial Loan and Thrift Act did not constitute interest within the meaning of section 1372(e) (5). Whether these charges constitute interest must be determined wholly with reference to the Federal revenue law and without regard to state law nomenclature. Burnet v. Harmel, 287 U.S. 103 (1932). Interest has been defined as the "amount which one has contracted to pay for the use of borrowed money," Old Colony R. Co. v. Commissioner, 284 U.S. 552, 560 (1932); and as "compensation for the use * * * of money," Deputy v. du Pont, 308 U.S. 488, 498 (1940). The amount to be charged in connection with a specific loan may be determined with reference to a number of factors: the duration of the loan; the risk undertaken and costs incurred by the lender in making the loan. But however it be fixed, that amount will be interest except to the extent that it constitutes consideration for something other than the loan itself, e.g., for services of a kind not normally incidental to the making of the loan. Western Credit Co., 38 T.C. 979 (1962), affd. per curiam *94 325 F.2d 1022 (C.A. 9, 1963); Seaboard Loan & Savings Association, Inc., 45 B.T.A. 510 (1941); Seaboard Small Loan Corporation, 42 B.T.A. 715 (1940). A lender dealing at arm's length will not advance funds to a loan applicant until he has satisfied himself as to the applicant's credit worthiness to a degree consistent with risk that the lender is willing to take. Procuring information as to the applicant's reliability may cause the lender to incur expense, and the lender may insist that the borrower bear this expense. Any additional charge imposed by the lender under circumstances such as those described above, is interest; for the borrower has bargained for and is to receive nothing more than the borrowed funds. The credit investigation for which he is being charged is merely incidental to and a necessary part of the making of the loan. This being the case, we are compelled to hold that the service charges authorized under the Tennessee Industrial Loan and Thrift Act constitute interest within section 1372(e) (5). [6]
*95 Petitioner finally asserts that "gross receipts" within the meaning of section 1372(e) (5) include the return of the principal of loans. This contention contradicts section 1.1372-4(b) (5) (iv), Income Tax Regs. For the reasons stated in I. J. Marshall, 60 T.C. 242, 248-250 (1973), we must reject petitioner's contention and reaffirm the validity of the aforesaid regulation. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated. ↩
2. Tennessee Code §§ 45-2001↩ et seq.
3. Tennessee Code § 45-2007↩(i)
4. The amount to be allowed as an addition to the reserve for bad debts has previously been settled. ↩
5. Although I. J. Marshall, 60 T.C. 242, 252 (1973), on appeal (C.A. 10, Nov. 12, 1973) and Joseph B. Zychinski, 60 T.C. 950 (1973), on appeal (C.A. 8, Feb. 25, 1974) were decided under sec. 1372(e) (5) as amended by Pub. L. 89-389 § 3(a), they are relevant in the interpretation of that statute as it existed prior to the aforesaid amendment. See S. Rept. No. 1007, 89th Cong., 2d Sess., (1966), 1966-1 C.B. 541. We also note at this juncture House v. Commissioner, 453 F.2d 982, (C.A. 5, 1972), reversing a Memorandum Opinion of this Court, in which the Fifth Circuit held that sec. 1372(e) (5) is inapplicable to lending or finance companies exempt from personal holding company status under sec. 542. While we disagree with House, we have followed it in Paul E. Puckett, T.C. Memo 1974-235, which arose out of facts identical to those now before us; for an appeal in Puckett would be made to the Fifth Circuit. See Jack E. Golsen, 54 T.C. 742 (1970), affd. 445 F.2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940↩ (1971). 6. Petitioner has cited Workingmen's Loan Assn. v. United States, 142 F.2d 359↩ (C.A. 1, 1944), in support of his contention that the service charges authorized under the aforesaid Tennessee statute are not interest. In Western Credit Co. this Court criticized Workingmen's Loan Assn. and indicated that the latter would not be applied by us in a manner inconsistent with our instant holding.